579 F.2d 1384
 1974-2 Trade Cases 75,188
 WHITE BAG COMPANY, a corporation, Appellee,
v.
INTERNATIONAL PAPER COMPANY, a corporation, Appellant.
WHITE BAG COMPANY, a corporation, Appellant,
v.
INTERNATIONAL PAPER COMPANY, a corporation, Appellee.
 Nos. 74-1552, 74-1576.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1974.
Decided Aug. 8, 1974.
 
 Lawrence E. Walsh, New York City (Henry L. King, Frank S. Moseley, Paul Robert Koepff, New York City, James B. Moore, Arthur M. Flowers, Jr., Moore, Flowers & Doar, Georgetown, S. C., and Davis, Polk & Wardwell, New York City, on brief), for appellant in No. 74-1552 and appellee in No. 74-1576.
 J. W. Alexander, Jr., Charlotte, N. C. (Horace L. Bomar, Spartanburg, S. C., Blakeney, Alexander & Machin, Charlotte, N. C., and Holcombe, Bomar, Cureton & Wynn, Spartanburg, S. C., on brief), for appellee in No. 74-1552 and for appellant in No. 74-1576.
 Before HAYNSWORTH, Chief Judge, and FIELD and WIDENER, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 We have for consideration the appropriateness of a preliminary, mandatory injunction requiring International Paper Company to deliver to White Bag Company monthly six hundred tons of multiwall kraft paper. The injunction was based upon a finding or conclusion that International had attempted to monopolize the multiwall bag market. We stayed the order of the District Court pending an expedited appeal, and, after full hearing, we conclude that the injunction was improvidently entered.
 
 
 2
 Among other things, International manufactures kraft papers, including multiwall papers. It also operates plants for the conversion of multiwall papers into bags for use in packaging relatively heavy materials. A portion of its multiwall paper production goes to supply its own bag plants, but most of it is sold to other bag manufacturers.
 
 
 3
 There are many manufacturers of multiwall paper bags. International is not the largest such converter, its sales of such bags accounting for only approximately nine per cent of such sales to the domestic market. International's production of multiwall paper before conversion into bags accounts for 13.8 per cent of the domestic market, there being some twelve to fourteen producers of such papers.
 
 
 4
 White Bag is a paper processor and bag manufacturer, some fifty to seventy-five per cent of its business being the making of multiwall bags. Until recently, it had purchased approximately fifty percent of its requirements of multiwall kraft paper from International.
 
 
 5
 In early 1973, International had eleven customers for multiwall kraft paper. White Bag was one of them. Each was being supplied under long term written contracts. White Bag's then current contract was for a three-year period ending May 31, 1973, with a provision for an automatic extension for an additional year unless one of the parties gave notice in advance of nonrenewal.
 
 
 6
 There began to develop a shortage in the supply of multiwall kraft paper, and there were limits to International's productive capacity. The situation led International to undertake a general review of its long term commitments to sell such paper. Moreover, International was unhappy with the terms of its contract with White Bag. Negotiations between the parties had been conducted through a broker, to whom International was required to pay approximately $30,000 a year. In addition, the contract contained a price reduction provision in the event White Bag could purchase comparable paper more cheaply from others. On at least one grade International's price was higher than that of some of its competitors, and price reductions had been extended to White Bag under that contractual provision.
 
 
 7
 In January 1973, and again in March, International gave White Bag written notice that the contract expiring May 31, 1973, would not be renewed for the additional option year. At the same time, White Bag was informed that International would continue to supply it on a monthly basis pending a possible negotiation of a term commitment.
 
 
 8
 In an effort to meet the increasing demand for its papers, International decided to reduce the number of grades it would offer to sell. To change a machine from one grade to another requires that the machine be stopped, and producing fewer grades was thought to contribute to longer runs and higher production from its paper machines. This decision was implemented on the production lines in July 1973, and contributed to a substantial increase in International's production of multiwall kraft papers. Still, demand during 1973 increased more rapidly than International's supply. During the fourth quarter of 1973 International was forced to reduce its committed shipments to all of its customers, including its own converting plants, by twelve per cent.
 
 
 9
 During 1973 International reviewed its relations with each of its eleven customers purchasing multiwall paper. A decision was made that it would continue long term commitments to six of its eleven customers and that it would sell to the remaining five to the extent that paper was available, but without a prior contractual commitment. The problems of brokerage and price preference entered into the decision that White Bag should not be one of the six with whom contractual commitments would be made. During 1973, International was considering whether, if its efforts to increase the productivity of its paper machines met with success, it could enter into a new term commitment to White Bag. There were discussions between representatives of the parties about it.
 
 
 10
 White Bag was advised in January 1974 that because of the heavy backlog of unfilled orders and persistent production problems, no long term commitment could be made to it but that International would sell multiwall paper to it when it had such paper available.
 
 
 11
 Because of the situation, only superficially sketched here, the District Judge found that International acted with good business reason in giving notice of the nonrenewal of White Bag's contract which would expire on May 31, 1973. There was similar good reason for including White Bag among those customers to whom International would not make additional long term commitments and to whom it would sell only when it had available paper.
 
 
 12
 Despite the finding of good reason for not continuing a long term commitment to White Bag and despite the fact that communications and conversations indicated that both parties understood that any long term commitment would be in writing, the District Court found that International had made an oral commitment to White Bag to supply it with six hundred tons of multiwall kraft paper each month, for a long but uncertain term, but concluded that the oral commitment could not be enforced because of the Statute of Frauds. However, it also concluded that International had attempted to monopolize the multiwall bag market, and, on the basis of that finding, it entered a preliminary mandatory injunction requiring International to deliver to White Bag six hundred tons of multiwall paper each month.
 
 
 13
 We find no basis in the record for a conclusion of an attempt to monopolize.
 
 
 14
 International had not increased its bag conversion capacity, and its share of the multiwall bag market had declined slightly over the preceding five years. The increases in paper production it was able to achieve went to its customers competing with it in the bag manufacturing business, not to enlarge its own production of multiwall bags. There is no suggestion that any merger or acquisition was contemplated; there was no conspiracy or action in concert with anyone else, and there is nothing else to indicate that there may be a substantial increase of International's nine per cent share of the multiwall bag market.
 
 
 15
 Nevertheless, and despite its finding that everything that International did was in its legitimate business interest, the District Judge found an attempt to monopolize. It recognized that International's nine per cent of the market was insufficient for an actual monopolization, but it rested its finding of an attempt to monopolize upon four factors:
 
 
 16
 1. It found that International had increased its supply of multiwall paper to certain of its customers, who were its competitors in the multiwall bag business. The fact that International used its increased production of paper to supply its customers in the multiwall bag business, rather than to increase its own proportion of the multiwall bag market, cannot support a finding of an attempt to monopolize either the bag or the paper market. It counters rather than supports the conclusion of attempted monopolization.
 
 
 17
 2. It was said that International "has reduced the total number of its customer-competitors to force them to the brink of going out of business." This has reference to International's decision to serve only six of its prior customers on long term commitments and to sell to the remaining five only when paper was available. Because of the supply and demand situation, it could not serve the needs of all eleven of its prior customers to the extent it previously had done, and its decision to serve the increasing needs of some, rather than restricting deliveries to all, had been recognized as a legitimate business decision. In any event, this kind of selectivity among customers, who are also competitors in the bag manufacturing business, arising out of exigent circumstances, does not support a finding of attempted monopolization, when International was producer of only a small proportion of multiwall paper and did nothing to increase its proportion of the multiwall bag market. However distributed among its prior customers, its successful efforts to increase its supply of papers going to its competitors in the bag business strongly indicates that it was not attempting to monopolize anything.
 
 
 18
 3. It was said that International "has avoided export sales in favor of concentrating its monopolistic designs on the domestic market." During the period of price controls, imposed to control inflation after the war in Vietnam, the world price for kraft paper was much higher than the controlled, domestic price. Some manufacturers of kraft paper diverted portions of their production for export at the higher world prices. International did not do that, preferring to supply the needs of its domestic customers, though they were also its competitors in the bag business. Again, the fact is inconsistent with the conclusion. In the context of attempted monopolization, it deserves credit, not censure, for its decision to devote its increasing production of paper, beyond the level requirements of its own converting plants, to the service of the needs of its competitors.
 
 
 19
 4. It was said that International "had begun solicitation of White Bag's customers." The preliminary record reveals that White Bag had approximately 350 customers for its multiwall bags. The testimony indicates that salesmen of International bags had called upon six of them. Four of them, however, were also previous customers of International and International salesmen had been calling upon the remaining two for some years without, however, effecting sales. If International were enlarging its own bag-making capacity, diverting multiwall paper to its own plants and, at the same time, engaging in massive solicitation of customers of bag manufacturers from whom International was diverting paper, we might have a different situation. As it is, continuation of its established relations with this handful of purchasers who were also among White Bag's large number of customers is a matter of no significance.
 
 
 20
 Thus, in the evidentiary facts found by the District Judge, there is no support for the conclusional facts upon which the attempted monopolization finding was premised. There is no basis in this record for a finding that International intended to monopolize either the bag or the multiwall paper markets. Indeed, all of the evidentiary facts point in the opposite direction.
 
 
 21
 There is no attempt to monopolize within the prohibition of § 2 of the Sherman Act, unless there is both an intent to monopolize and a "dangerous probability" that an actual monopoly will be achieved. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); McElhenney Co. v. Western Auto Supply Co., 4 Cir., 269 F.2d 332 (1959). A monopoly within the prohibition of § 2 has been found only in cases in which the monopolist was truly predominant in the market. In Hiland Dairy, Inc. v. Kroger Co., 8 Cir., 402 F.2d 968, there is a tabulation of the relevant cases in which it appears that when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market. International's enjoyment of only nine per cent of the relevant market is far from possession of that kind of power or control, as the District Court recognized. Since it has been doing nothing to enlarge its share of the market and since it has dedicated the increase in the production of multiwall paper to the service of the needs of its competitors, there is no basis for a conclusion that there is "a dangerous probability" that International will achieve monopoly power.
 
 
 22
 In its cross-appeal, White Bag contends that a preliminary injunction should have been premised upon the District Court's finding of a verbal commitment by International to deliver six hundred tons of paper to it each month. But there are several difficulties in the way. If the finding is not clearly erroneous in light of the previous relations between the parties, the references to the possibility of negotiation of a new written contract, and International's theretofore invariable practice of making long term commitments only in formal written contracts, there are a succession of other obstacles to be met. There is the Statute of Frauds, an obstacle which the District Court concluded was insurmountable. If that Statute were avoided, there would still remain the problem of whether the alleged oral commitment was so incomplete in its terms that it could not be enforced at all, and the still further problem whether, though enforceable in an action at law for its breach, it would warrant an order of specific performance. With such substantial hurdles to be negotiated, we find no possible basis for a conclusion that there was an abuse of the discretion of the District Judge in denying a preliminary injunction having the effect of an order of specific enforcement of the oral commitment.
 
 
 23
 This appeal has brought up only the question of the appropriateness of a preliminary injunction. We deal with a record which may be incomplete, and we decide only the preliminary question. We should not be understood to have circumscribed, in any way, the District Court's consideration of the merits of the controversy.
 
 
 24
 The case will be remanded to the District Court with instructions to vacate the preliminary injunction, the operation of which is now stayed by our order.
 
 
 25
 INJUNCTION VACATED AND CASE REMANDED.