**ABCOR CORPORATION; James G. Kibler, Sr., Plaintiffs–Appellants,**

v.

**AM INTERNATIONAL, INC., Defendant–Appellee.**

No. 89–2205.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1990.

Decided Oct. 15, 1990.

As Amended Nov. 6, 1990.

Daniel S. Koch, Kurz, Koch & Doland, Washington, D.C., argued (James S. Kurz, Patrick W. Reilly, Kurz, Koch & Doland, Washington, D.C., on the brief), for plaintiffs-appellants.

Arthur Douglas Melamed, Wilmer, Cutler & Pickering, Washington, D.C., argued (Thomas S. Connell, Ana Maria Martinez, Wilmer, Cutler & Pickering, Washington, D.C., on the brief), for defendant-appellee.

Before PHILLIPS, Circuit Judge, SMITH, Senior Judge, United States Court of Appeals for the Federal Circuit, sitting by designation, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.

JOSEPH H. YOUNG, Senior District Judge:

Abcor Corporation (Abcor) and its owner, James Kibler, appeal the grant of summary judgment by the district court in favor of the defendant AM International, Inc. (AMI), in this antitrust action alleging an illegal scheme to drive Abcor out of business. Because we find no material issues of fact, we affirm the judgment of the district court.

## I.

AMI manufactures and services Multigraphics printing equipment worldwide.

Abcor provides maintenance and repair services for AMI machines in the Washington, D.C., area. Abcor's owner, James Kibler, was a service technician at AMI until 1973 when he left to start his own company servicing AMI machines. He took six AMI employees with him at the time and over the years has hired numerous AMI employees. While AMI is a much larger company overall, Abcor has become the dominant service company for AMI machines in the Washington area. Of the 3,000 such machines in the Washington area, 2,200 are serviced in-house by the owners. Of the remaining 800 machines, Abcor services about 400, AMI services 200, and other competitors service 200.

In January 1987, AMI began negotiations with Abcor to purchase the company. The parties apparently reached a preliminary agreement, but AMI terminated the negotiations. AMI decided that it would rather compete for a larger market share in Washington rather than purchase one through the acquisition of Abcor, and it is clear that AMI did in fact step up its efforts to gain a larger share of the market. The dispute in the case turns on whether those efforts were legal competition on the merits or illegal anticompetitive measures designed to drive Abcor out of business.

Plaintiffs allege that AMI took the following steps to destroy Abcor:

1. created a low-priced, deceptive service contract to target Abcor's customers;
2. improperly used a list of Abcor's customers and financial information allegedly obtained during the acquisition negotiations to solicit Abcor's customers and undercut Abcor's prices;
3. inhibited Abcor's purchase of AMI parts by terminating Abcor's over-the-counter access to parts in AMI's Washington area supply depot and terminated its acceptance of telephone orders from Abcor in the Chicago parts center (requiring written orders);
4. attempted to spread false information about Abcor to the effect that the company was going to go out of business; and
5. hired Abcor employees to hurt the company and steal customers.

Abcor and its sole owner, Kibler, filed suit in the Federal District Court for the Eastern District of Virginia alleging violation of § 2 of the Sherman Act for monopolization and attempted monopolization in addition to state law violations based on defamation and tortious interference with business relations. After substantial discovery, the district court granted summary judgment in favor of the defendants. The district court found that a genuine issue of fact existed concerning the market definition and whether there was a dangerous probability of success in the attempt to monopolize. However, these issues were rendered immaterial by the holding of the court that the plaintiff had failed to produce evidence to support a finding of (1) an intent to monopolize, (2) anticompetitive activity, or (3) antitrust injury. The court dismissed the federal claims and then exercised its discretion to dismiss the pendant state law claims without prejudice. Abcor now appeals to this court, and we affirm.

II.

■ A plaintiff seeking to establish attempted monopolization under § 2 of the Sherman Act must show three things: (i) the defendant formed a specific intent to monopolize the market, (ii) the defendant engaged in anticompetitive or predatory conduct designed to further that intent, and (iii) a dangerous probability of success. *White Bag v. International Paper*, 579 F.2d 1384, 1387 (4th Cir.1974). On a motion for summary judgment made by the defendant, the plaintiffs are entitled to have all reasonable inferences drawn in their favor. The plaintiffs must, however, produce evidence to support a finding on each essential element to their case. Rule 56(e), Fed.R.Civ.P.; *Matsushita Electric Industry Co. v. Zenith Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). We review the decision of the district court to grant summary judgment *de novo*.

1. *Specific Intent to Monopolize*

■ The Supreme Court has held that attempted monopolization requires "a specific intent to destroy competition or build monopoly." *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient. *United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977) ("No inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales."). The plaintiff must show that the defendant sought to create a monopoly by circumventing the competitive process. The requisite intent may be shown through direct evidence or through inference by showing anticompetitive practices. *See, e.g., Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 905 (8th Cir.1985).

The district court found that the "sporadic activity on the part of AMI is insufficient to show ... specific intent ... to destroy Abcor's ability to compete in the alleged market...." [1] Abcor argues that the court ignored both direct and circumstantial evidence that AMI sought to destroy Abcor through anticompetitive tactics.

Abcor's strongest direct evidence of intent derives from deposition testimony by Kibler. Kibler testified that an AMI manager called him shortly after AMI decided not to buy Abcor and said that AMI had decided that it did not need to buy Abcor because it could acquire its business through competition. An AMI salesman provided some corroboration by testifying that "top management" at AMI felt that it "could eventually get the business a little at a time, and therefore it wasn't worth it, buying it outright."

■ Plaintiffs argue that in the context of a motion for summary judgment the court must accept Kibler's inference that these statements imply a plan to destroy Abcor through illegal, anticompetitive actions. Plaintiffs seek to bolster this inference by arguing that since AMI had not been successful competing with Abcor in the past (resulting in its low market share), its renewed effort must have involved more than just straightforward competition on the merits.

The argument fails, however, because the statements quoted above do not show any evidence of illegal intent. By themselves, the statements show only that AMI planned to increase its competitive activity in the Washington area. While plaintiffs attempt to rely on Kibler's testimony that he interpreted AMI's statements and actions as indicative of illegal anticompetitive intent, he had no basis from which to make such an inference. In essence, he seeks to create a material factual dispute by asserting that he believes AMI had an anticompetitive plan. These bald assertions are not enough to survive summary judgment. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ Even if the record does not contain sufficient direct evidence to support a finding that AMI possessed the specific intent to monopolize the relevant market through anticompetitive means, plaintiffs assert that the trier of fact may also infer specific intent from a series of anticompetitive acts. Plaintiffs argue that AMI engaged in at least five separate illegal, anticompetitive acts. However, as discussed more fully herein, none of the actions relied upon by plaintiffs rise to the level of illegal competition. Even viewing the acts as a whole, the record reveals no more than vigorous com-

1. We assume, without deciding, that the relevant market consists of the servicing and repair of AMI machines in the Washington, D.C., area. As we discuss below, the district court found a genuine issue of fact concerning the market definition. Because of our disposition of the other issues in this case, however, we need not reach the issue of market definition.

petition which did not rise to the level of an antitrust violation.

## 2. *Anticompetitive Activity*

To prove a violation of § 2 of the Sherman Act, plaintiffs must also show that the defendant engaged in anticompetitive or predatory conduct designed to further an intent to monopolize. Here plaintiffs allege that AMI engaged in a series of anticompetitive activities designed to destroy Abcor. We address each in turn.

### a. Discriminatory and Deceptive Pricing

In the past, Abcor has been able to offer its maintenance and repair services at prices about 20% less than those offered by AMI. Plaintiffs contend that AMI responded by instituting price reductions that, although they did not rise to the level of predatory pricing, were nonetheless deceptive. AMI allegedly offered its standard service contract, the Preventive Maintenance Agreement (PMA), to at least one Abcor customer at a substantial discount and then falsified its own records to hide this discount to avoid giving a similar discount on its General Services Administration (GSA) contract. In particular, one AMI employee testified that, when he could not locate a file during discovery, he was told to create a dummy contract and "bring it to court." AMI also began offering a new Full Maintenance Agreement ("FMA"), which plaintiffs assert was deceptive because it offered essentially the same service as the PMA, but at a lower price.[2] Plaintiffs assert that the FMA was a special contract designed for use solely in the Washington area against Abcor.

■ The GSA contract referred to by plaintiffs requires AMI to give comparable price discounts on its GSA Schedule Contract as it gives to an "identified customer or category of customers." AMI suggests that any price cuts to Abcor customers would not invoke this clause because the "identified category of customers" was limited to states. Despite substantial discovery, plaintiffs remain unable to counter

AMI's explanation of the GSA contract price reduction clause. In any event, Abcor may not complain of an antitrust violation if AMI violated a duty to a third party by engaging in what would otherwise be legitimate competition on the merits.

A further problem with plaintiffs' argument arises because the price cuts were not predatory, *i.e.*, selling below cost to drive Abcor permanently out of the market to enable future monopolistic behavior. Given that AMI faced stiff competition in the Washington area from Abcor, it was entitled to respond with non-predatory price cutting. If anything, AMI's actions suggest enhanced competition.

While plaintiffs admit that the price cuts by AMI were not predatory, they nonetheless contend that the price discounts were irrational and anticompetitive because AMI risked having to reduce its GSA contract price just to compete with Abcor. This argument encounters several problems. First, as discussed above, plaintiffs have not produced evidence to show that AMI actually risked reductions in its GSA contract prices. Second, they have neither contended nor shown that the discounted prices were below costs. As a result, even if AMI had to reduce prices on the GSA contract, the price scheme would not be predatory. Finally, the evidence clearly indicates that AMI did not expect to reduce its prices on the GSA contract and was thus not expecting to suffer the losses asserted by plaintiffs. Whether or not such an action would violate AMI's contract with GSA concerns GSA, not Abcor.

### b. Misuse of Confidential Financial and Customer Information

Plaintiffs argue that AMI obtained Abcor's customer list during the negotiations to acquire Abcor and then used that list to solicit Abcor customers. This argument encounters at least two problems. First, while it is clear the AMI has an Abcor customer list, plaintiffs do not know how AMI obtained the list. Kibler cannot re-

---

**2.** The alleged deception would not have harmed consumers because they would ostensibly have received the same service as under the PMA contract, but at a lower price.

member whether or not he supplied AMI with a list during the negotiations. AMI could well have obtained the list through legitimate means. Kibler admitted that Abcor has an AMI customer and price list. If legally obtained, the defendant was free to use it to locate potential customers for solicitation. Second, Abcor admits that its customer list is not secret. AMI sold all of the equipment in the alleged market, so it knows who requires service.

■ Plaintiffs also contend that AMI obtained financial information during the acquisition negotiations and used the information to infer Abcor's profit margin. With such information, they assert, AMI could then determine exactly how low it had to cut prices to eliminate Abcor's profits. AMI responds by pointing out that it obtained only aggregate financial information, nothing with specific information on profit margins. While use of financial information revealed in acquisition negotiations would abuse Abcor's confidence in revealing the information, such use would not necessarily constitute a violation of the antitrust laws. Moreover, nothing in the record shows that AMI actually used the information in this way. Mere assertions by the plaintiffs are not enough to survive summary judgment.

### c. Selective Denial of Parts

For many years, Abcor was able to purchase parts for AMI machines over-the-counter at AMI's parts depot in the Washington area. In mid–1988, AMI terminated this service for all "non-end users" (including Abcor) and terminated Abcor's ability to order parts by telephone from the Chicago parts center. Abcor is free to order parts, but it must do so in writing. While Abcor has not lost any customers because of these decisions, plaintiffs allege that the new system inhibits Abcor's ability to handle emergencies. These hindrances, they argue, were instituted as part of an overall plan to destroy Abcor.

AMI responds that the Washington area parts depot is only for AMI servicing. It sometimes lets machine owners servicing their own equipment buy directly to foster goodwill. AMI declines to sell locally to Abcor because it feels Abcor should bear its own inventory costs. The plaintiffs are free to purchase parts from Chicago. In fact, total purchases have increased in recent years. If Abcor wants to ensure emergency access to a supply of parts, it may do so by maintaining its own stockpile rather than "free riding" on the inventory costs incurred by AMI. AMI says it terminated its acceptance of phone orders to avoid confusion and disputes over orders.[3] In addition, AMI points out that Abcor has not lost a contract because it was unable to get parts.

■ In general, a seller has the right to choose with whom it wishes to deal. For example, in *Olympia Equip. Leasing v. Western Union Telegraph*, 797 F.2d 370 (7th Cir.1986), the defendant Western Union had encouraged competition in the telex equipment market by having its salesmen sell competing equipment, including the plaintiff's. When Western Union ceased having its own salesmen market competing equipment, the plaintiff filed suit. The court held that "a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or otherwise pulling its competitive punches." 797 F.2d at 375. The plaintiff had no right to "free ride" on the sales force of the defendant. *Id.* at 377–78. *Cf. Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (monopolist film maker did not have to facilitate competition from other camera manufacturers by revealing new film prior to marketing).

The right to refuse to deal, however, is not unfettered. The plaintiffs here point to the decision in *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir.1987). In *Hartz*, the court upheld a verdict for the plaintiff under the Sherman

---

**3.** AMI acknowledges that it sometimes allows phone orders from individual customers that are smaller with a lower risk in case of error.

Act. Plaintiff, a former distributor for the defendant Hartz, was terminated after it began to carry competing brands. The court noted that "[a]lthough a refusal to deal, without more, does not violate the antitrust laws, the Supreme Court has found that '[i]f accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the [Sherman] Act.'" 810 F.2d at 802 (quoting *Times–Picayune*, 345 U.S. at 625, 73 S.Ct. at 889).

AMI's change in parts policy simply does not rise to the same level of anticompetitive activity. The defendant in *Hartz* completely severed business relations with the plaintiff. By contrast, AMI has not eliminated Abcor's access to parts. It has only eliminated Abcor's "free ride" by shifting the inventory cost to the plaintiff.

### d. Lies and Misinformation

Plaintiffs further contend that AMI engaged in a campaign of spreading lies and misinformation to create the impression that Abcor was going out of business. These accusations stem from two events. In the first, Bonnie Dunsing, an AMI employee, testified that an AMI manager, Ron Gallier, instructed her to call Abcor customers and tell them that Abcor was going out of business altogether. While Abcor was in fact going out of the graphics *supplies* business, it was continuing its *service* business. Dunsing refused to make the calls and was terminated soon thereafter for revealing confidential information to a competitor. AMI responds by arguing that Dunsing misconstrued her instructions because, as she admitted, Gallier never specifically referred to the *service* business, only to going out of business in general.

In the second incident, an AMI salesman told the AFL–CIO, a large Abcor customer, that Abcor was going out of the supplies business and might soon go out of the service business as well. While plaintiffs concede that the AMI salesmen said nothing untrue, the customer was left with the incorrect impression that Abcor would be going out of business entirely. AMI cor-

rected the misunderstanding as soon as it became aware of the mistake.

■ The record contains evidence indicating that both incidents may have occurred and the incidents lend some weight to the plaintiffs' allegations. Nevertheless, these two incidents alone do not, without more, constitute enough evidence to support a finding of attempted monopolization. To avoid summary judgment, the plaintiffs must produce not "merely colorable" but "significantly probative" evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

### e. Hiring of Abcor Employees

The plaintiffs allege that AMI hired two Abcor service technicians, when they were not needed, to hurt Abcor and help solicit Abcor customers. As AMI points out, Kibler is a former AMI employee who started Abcor with six former AMI employees. Abcor has consistently hired AMI employees and used them to garner customers away from AMI. The fact that AMI has now hired two back is only a sign that it is fighting back. Kibler himself described the situation as "[y]ou lose two, you get two back."

■ In the specific instances at issue here, nothing suspicious taints the hiring of the two employees. Both had strong motivations to leave Abcor. One was divorcing Kibler's daughter. The second was experiencing personal problems, had left Abcor before, and had been reprimanded on numerous occasions at Abcor. AMI claims, and Abcor does not dispute, that both employees initiated the contact. Moreover, special concern must be given to finding antitrust violations for hiring personnel away from competitors. Courts should be careful not to impede the ability of the employee to market his or her skills. III Areeda & Turner, *Antitrust Law* § 738d (1978).

### f. AMI's Actions Viewed as a Whole

Plaintiffs argue that even if each individual action cited above does not amount to

an antitrust violation, the court should look at the defendant's actions as a whole and infer a pattern of anticompetitive activity. While the court should view the entire record, the actions here do not support a finding of anything more than aggressive competition. Even if AMI has engaged in some unfair competition, as we noted in *Military Services Realty, Inc. v. Realty Consultants of Virginia, Ltd.*, 823 F.2d 829, 832 (4th Cir.1987), " 'courts should be circumspect in converting ordinary business torts into violations of antitrust laws. To do so would be to 'create a federal common law of unfair competition' which was not the intent of the antitrust laws.' " [4] The "sporadic activity" identified by the plaintiffs does not amount to an antitrust violation.

### 3. *Antitrust Injury*

 The district court held that plaintiffs had failed to produce evidence of any antitrust injury. The court noted that Abcor had not lost a single customer or contract or any loss of market share, and nothing indicated any loss stemming from illegal, anticompetitive activity. The Sherman Act is designed to protect competition, not competitors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The plaintiffs point to testimony from its economic expert indicating that Abcor's profit margin had declined in the last two years, just after AMI is alleged to have started its campaign to drive Abcor out of business. While Abcor's profit margin may have declined, the plaintiffs have failed to show a causal link to anticompetitive activity. More aggressive competition on the merits from AMI may also have reduced Abcor's profit margin as it struggled to respond. For example, having to warehouse its own supply of parts rather than relying on AMI may have increased Abcor's costs. Plaintiffs' expert, who was unfamiliar with the term "antitrust injury"

prior to his deposition, did not identify the source of the reduced profit margin.

### 4. *Market Definition and Dangerous Probability of Success*

Plaintiffs seek a narrow market definition limited to the servicing of AMI equipment in the Washington, D.C., area. AMI argues that servicing of similar equipment made by other manufacturers and servicing of other reproductive equipment, such as photocopying machines, should be included. The district court found a genuine issue of fact existed concerning market definition and refused to grant the defendant's motion for summary judgment on this issue.

The district court also declined to grant summary judgment on the issue of dangerous probability of success. AMI argues that, in the Fourth Circuit, no dangerous probability of success exists as a matter of law unless the defendant controls 70% of the market. *See White Bag Co. v. International Paper Co.*, 579 F.2d at 1387. AMI has, at most, 25% of the relevant market. In fact, Abcor dominates the local market. Plaintiffs argue that if AMI succeeded in driving Abcor out of the market, AMI would probably attain more than 70% of the market. The fact that Abcor has a bigger share now, they contend, is negated by the much greater size of AMI overall.

Because we affirm the district court's grant of summary judgment on the issues of specific intent and anticompetitive activity, we need not, and do not, reach these other questions.

### III.

Plaintiffs have produced evidence to show that AMI sought to increase its market share and perhaps even to drive Abcor out of the market completely. However, "[t]he antitrust laws were designed to protect competition, not competitors. The elimination of a single competitor[,] standing alone, does not prove anticompetitive effect." *Military Serv. Rlty.*, 823 F.2d at

---

**4.** Quoting *Merkle Press, Inc. v. Merkle*, 519 F.Supp. 50 (D.Md.1981) (citing *Mar Food Corp.*

*v. Doane*, 405 F.Supp. 730, 731 (N.D.Ill.1975).

**932**

832 (citations omitted). When the record is viewed as a whole, it shows no more than that the defendant began a campaign of more aggressive competition, which has not been very successful. Injury to Abcor, if any, is the result of more competition, not predatory action. We therefore affirm the grant of summary judgment in favor of the defendant by the district court.

AFFIRMED.