**ADVANCED HEALTH-CARE SERVICES, INC., Plaintiff,**

v.

**GILES MEMORIAL HOSPITAL & Medserv Corporation, Defendants.**

Civ. A. No. 88–0346–R.

United States District Court, W.D. Virginia, Roanoke Division.

March 15, 1994.

---

John Thomas Arnold, Moss & Rocovich, P.C., Roanoke, VA, James A. Burt, Strong & Associates, P.C., Springfield, MO, for Advanced Health–Care Services, Inc.

Michael F. Urbanski, Heman Alexander Marshall, III, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for Giles Memorial Hosp. and Health East.

Charles Nealson Dorsey, William Hitchcock Lindsey, Bounds & Dorsey, P.C., Roanoke, VA, George R. Clark, Robert J. Aamoth, Alexander P. Starr, Reed, Smith, Shaw & McClay, Washington, DC, for Medserv Corp.

### *MEMORANDUM OPINION*

TURK, District Judge.

### I.

This multi-count antitrust case was filed by Advanced Health–Care Services, Inc. ("AHCS"), a corporation engaged in the busi-

ness of renting and selling durable medical equipment ("DME") in southwest Virginia.[1] Defendant Giles Memorial Hospital ("Giles Memorial") is a Virginia not-for-profit hospital corporation in Pearisburg, Virginia. Defendant Medserv is a corporation engaged in the business of renting and selling DME.[2] On August 1, 1985, Giles Memorial and Medserv entered into a contract to provide DME to residents in Giles Memorial's service area.[3] This joint venture contract established a home DME business located in Giles Memorial called Home Connections. Under the contract, Giles Memorial essentially provided office space and Medserv provided personnel and DME. Giles Memorial received thirty-five percent of Home Connections' collections. In 1991 the Giles Memorial–Medserv contract was terminated. Home Connections terminated at the same time.

AHCS and another DME business, McLean's Drug, shared the DME business from Giles Memorial prior to the entry of Home Connections into the market.[4] AHCS' market share predictably declined after Home Connections started up. This decline in business led AHCS to close its Pearisburg office on March 31, 1986. AHCS filed this lawsuit on August 1, 1988. By order of this court dated December 29, 1988, this case was dismissed pursuant to Fed.R.Civ.P. 12(b)(6). The Fourth Circuit Court of Appeals reversed, *Advanced Health–Care Services, Inc. v. Radford Community Hosp.*, 910 F.2d 139 (4th Cir.1990) ("*Radford*") and set forth the law of this case. Extensive discovery is now complete and defendants have filed a joint motion for summary judgment. As the court finds that plaintiff has not met its burdens to go forward with trial, defendants' motion is granted. AHCS' second amended complaint

alleges seven counts of federal and state antitrust violations; these will be examined in turn.

## II.

The complex nature of antitrust litigation encourages summary disposition of such cases where permissible. The Fourth Circuit Court of Appeals has approved of the use of summary judgment in antitrust cases. *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 708 (4th Cir.1991) (*en banc*), *cert. denied,* — U.S. —, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). In a case with as much complicated and detailed evidence as this, once the moving party has met its burden under Fed.R.Civ.P. 56(c), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986), but must come forward with sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Abcor Corp. v. AM Intern., Inc.*, 916 F.2d 924, 930 (4th Cir. 1990). After four years of discovery, plaintiff has not been able to come forward with significantly probative evidence sufficient to create a triable issue of fact.

## III. Unreasonable Restraint of Trade

Count 1 of plaintiff's second amended complaint alleges that defendants' implementation of the August 1, 1985 contract constituted an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[5] To prove that the contract con-

---

1. DME consists of canes, crutches, oxygen equipment, wheelchairs, walkers, hospital beds and other items used by persons recuperating at home from an accident or illness.

2. Medserv is the corporate successor to Primedica, Inc., which itself was the corporate successor to Inhalation Therapy Services, Inc. Throughout this opinion, these entities will be referred to as "Medserv."

3. This was the second contract between Giles Memorial and Medserv. The first contract in-

volved the provision of respiratory therapy services at the hospital and is not in issue here.

4. Indeed, both businesses had paid employees working in Giles Memorial's respiratory services department, and these employees roughly split referrals for DME.

5. Although plaintiff's second amended complaint alleges that the contract was entered into in 1984, it is clear from the context of the complaint that plaintiff refers to the August 1, 1985 contract between Giles Memorial and Medserv.

stituted an unreasonable restraint of trade, the Fourth Circuit instructed that AHCS must show:

> (1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy.

*Radford*, 910 F.2d at 144 (quoting *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 n. 10 (4th Cir. 1985)).

 Plaintiff has not produced significantly probative evidence that the contract produced adverse, anticompetitive effects within the relevant product and geographic market. The parties have agreed, at least for the purpose of this motion, that the relevant product market is DME and the geographic market is the "greater Pearisburg, Virginia region," or Giles County. Prior to the entry of Home Connections, AHCS and McLean's Drug roughly split the market.[6] After Home Connections entered the market, Super-Aid also began to do business in the DME market. The market became less concentrated after the entry of Home Connections, as consumers had a greater choice of suppliers. Plaintiff has submitted no evidence indicating that prices increased upon Home Connections' entry. For example, as might be expected from the appearance of new competitors, prices for oxygen concentrator rentals declined during the period in question. Nor has plaintiff demonstrated a substantial or continuing decline in the quality of DME available to consumers in the market as a result of any actions of Home Connections.[7] Thus, since plaintiff has neither demonstrated a rise in the price or reduction in quality of DME, nor a decrease in the number of firms supplying DME to consumers in Giles County, "[t]he aphorism that 'the antitrust

laws were enacted for the protection of *competition* not *competitors*' rings true in this case." *Oksanen*, 945 F.2d at 709 (citations omitted). *See also Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F.Supp. 1196 (W.D.N.C. 1989) (plaintiff's § 1 claim dismissed—general market condition for plastic bottles was more competitive after joint venture contract since price and market concentration decreased, production increased and overall quality and service was substantially unchanged), *aff'd per curiam*, 912 F.2d 463 (4th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1019, 112 L.Ed.2d 1101 (1991).

AHCS may have been hurt by Home Connections' entry into the market, but there is no evidence that competition as a whole in the relevant market has been harmed. Based on the foregoing, plaintiff is unable to establish that the contract produced adverse, anticompetitive effects within the relevant product and geographic market; therefore, summary judgment is appropriate for Count 1.[8]

## IV. Monopolization

 Plaintiff alleges in Count 2 that defendants monopolized the DME market in Giles County in violation of section 2 of the Sherman Act. 15 U.S.C. § 2. To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary or predatory manner, and causal antitrust injury. *Radford*, 910 F.2d at 147. Plaintiff alleges that Home Connections possessed at least a seventy-five percent market share of the DME market in Giles County and that this constitutes monopoly power. Defendants claim that Home Connections never achieved a dominant share of the DME market in Giles County. Numerous cases and commentators have suggested that absent extraordinary

---

6. Plaintiff's expert estimates that AHCS and McLean's combined market share exceeded 93 percent in 1985 prior to the entry of Home Connections in the DME market.

7. Although plaintiff has found a few specific instances of substandard quality of Home Connections' DME, Home Connections' inter-office memoranda suggest that the company was concerned about the lapses in quality; this concern seems unusual in a firm that was allegedly impervious to competition.

8. As discussed in the monopolization section, plaintiff is also unable to establish that the objects and conduct pursuant to the contract were illegal or that it suffered antitrust injury.

circumstances, a market share over fifty percent is required to show market power.[9] Plaintiff's evidence of market share was compiled by its expert, Dr. Roger Blair. Dr. Blair reports that Home Connections' market share reached a peak of 57.8 percent in 1989. Dr. Blair made two mistakes in his calculations. First, Dr. Blair calculated Home Connections' market share based on billed revenue, while calculating all other suppliers' market shares on collected revenue. Second, Dr. Blair calculated Home Connections' market share based on revenue from Giles County residents and from non-Giles County residents, but calculated others suppliers' market shares based on revenue from Giles County only.[10] When these mistakes are corrected, Home Connections' true market share of DME in Giles County peaks at 44.1 percent in 1989 and averages 32.9 percent over the 1986–1989 period of its existence. Thus, defendants' market share was significantly below the established floor for showing monopoly power.

■ Another means of viewing monopoly power is through market share trends. If the defendants' market share is declining and/or other competitors' market shares are rising, then the defendants can hardly possess monopoly power. See, e.g., Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir.1982) ("The fact that [defendant's] share of the market was declining also belies whatever inference of capacity to monopolize that may be drawn from the size of its market share."); United States v. Syufy Enterprises, 903 F.2d 659, 666 (9th Cir.1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to maintain market share.") (emphasis in original). Toward the end of the relevant time period, Home Connections steadily lost ground to other DME firms. For example, from 1989 to 1990, Home Connections' market share dropped 22.7 percent, while McLean's market share rose 13.7 percent, Hometown's market share rose 62.5 percent, and Super–Aid's market share rose 140 percent.[11]. AHCS's market share fell 2.7 percent, but given its competitors' gains, it would be speculative to attribute plaintiff's loss to defendants' exercise of market power. Moreover, in 1991 Home Connections went out of business, which was certainly not indicative of monopoly power.[12]

Plaintiff contends that extraordinary market circumstances existed that would permit a finding of monopolization despite market shares below 50 percent. See Fineman, 980 F.2d at 202. Dr. Blair argues that market share data based on revenues understate Home Connections' market power because

9. In United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir.1945), Judge Learned Hand suggested that while 90 percent of the market "is enough to constitute a monopoly, it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." See also White Bag Co. v. International Paper Co., 579 F.2d 1384, 1387 (4th Cir. 1974) (cases have shown that "when monopolization has been found the defendant controlled seventy to one hundred percent of the relevant market"); Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 201–02 (3d Cir.1992) ("A significantly larger market share than 55 percent has been required to demonstrate prima facie monopoly power."), cert. denied, — U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 and 489–90 n. 11 (5th Cir. 1984) (requiring a market share of at least 50 percent); P. Areeda and H. Hovenkamp, Antitrust Law ¶ 518.3c at 549 (1992 Supp.) ("[T]here is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute monopoly power.").

10. Plaintiff does not deny these errors; rather, plaintiff asserts that the correct measure of market share is in new referrals, not revenues. Dr. Blair claims that Home Connections secured over 78 percent of DME referrals from Giles Memorial. This statistic is not relevant, however, because the proper geographic market for this analysis is Giles County, not Giles Memorial Hospital.

11. It is significant that Super–Aid Pharmacy entered the market during the period of alleged monopoly power. The DME market is characterized by low barriers to entry, which makes exercise of monopoly power nearly impossible, as any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods for less. See Syufy Enterprises, 903 F.2d at 664–65.

12. During the relevant period, market concentration lessened notably as Home Connections, AHCS and McLean's all possessed more than 10 percent market shares and the smaller DME suppliers' business grew.

they included ongoing rental revenue from patients who selected their DME supplier before Home Connections began operations in August 1985. However, the majority of rental revenue is derived from oxygen concentrators, and the average rental period for oxygen concentrators is five months. Thus by 1986 the skewing effect of pre-existing oxygen patients would have faded.

■ Plaintiff's principal allegation of exclusionary or predatory conduct is that discharge planners employed by Home Connections steered to Home Connections all Giles Memorial patients in need of DME upon discharge. Plaintiff alleges that Medserv and Giles Memorial contracted to make Home Connections a "preferred provider" through a kickback arrangement with Giles Memorial's discharge planners. The evidence does not support these allegations. No Giles Memorial discharge planner was employed by Home Connections or Medserv. In recognition of the potential antitrust implications of the contract, Giles Memorial's Administrator instituted a hospital policy of (1) advising all patients requiring DME of all suppliers in the community, (2) refraining from recommending any particular supplier, and (3) requiring the patient to choose a desired supplier. Giles Memorial prepared a "freedom of choice" form listing known DME suppliers in the community, including AHCS. After the patient made a selection, the chosen supplier was notified and DME was ordered therefrom. Though this form was not found in all patient records, it was found in the files of 83 percent of discharged Giles Memorial patients who chose Home Connections.

■ Although plaintiff alleged that over 85 percent of discharged Giles Memorial patients in need of DME selected Home Connections, plaintiff's expert was able to trace

only 8.9 percent of new DME rentals in Giles County during 1985–1990; he found that 59 of the 75 patients whose records he could trace selected Home Connections. This sample cannot provide a sound statistical basis for inference of steering by defendants, as the few files found may merely show that some firms kept better records.[13]

Plaintiff has not come forward with a single former Giles Memorial patient who claims to have been influenced to choose Home Connections, or who "did not believe they were given a choice,"[14] despite its identification above of 75 potential candidates for steering. Nor has plaintiff found any Giles Memorial physician or employee who systematically referred patients to Home Connections. Its only evidence of steering comes from two former Home Connections employees who left Home Connections in the spring of 1986, Michael Lawhorn and Debra Lee. They claim to have been told to steer patients to Home Connections, and to switch patients who already had DME in their homes from AHCS or McLean's to Home Connections. Both admit that they have never steered a new DME patient to Home Connections or switched an existing AHCS or McLean's patient to Home Connections. They never watched a single patient select a DME supplier; they never witnessed a single patient being steered to Home Connections. Therefore, neither has personal knowledge of actual predatory conduct by defendants.[15]

"A firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is simply exploiting the competitive advantages legitimately available to it." *Radford,* 910 F.2d at 147 n. 14. Plaintiff has produced no significantly probative evidence that defendants went beyond the competitive

13. For example, no records of discharged Giles Memorial patients who selected AHCS were found; Dr. Blair therefore speculates that AHCS received zero percent of DME orders by former Giles Memorial patients from 1985–1990.

14. Plaintiff's one witness who claimed to have not been informed of alternative DME suppliers, Mrs. Ethelene Atwell, later recanted her affidavit, explaining that she did not understand the affidavit that she signed for plaintiff.

15. Similarly, Mary Ellen Britts and Don Walker have no personal knowledge of whether defendants steered Giles Memorial patients to Home Connections. Their testimony presented by plaintiff is inadmissible hearsay, as is Lawhorn's assertion that he heard that physicians were coerced to refer patients to Home Connections.

advantages legitimately available to Home Connections: goodwill and confidence engendered by the satisfactory provision of hospital services and continuity of care from the hospital to the home.

■■■■ Antitrust injury arises only from harm to the competitive process itself and not from harm to a single competitor. AHCS must show that defendants caused harm to the process of competition that existed in the DME market prior to Home Connections entry into it, not just that AHCS was injured. *See Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 487–89, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977); *Military Services Realty, Inc. v. Realty Consultants of Virginia, Ltd.,* 823 F.2d 829, 832 (4th Cir.1987) ("The elimination of a single competitor standing alone, does not prove anticompetitive effect."). As discussed above, the Giles County DME market became more competitive in the late 1980s than it had been prior to Home Connections' entry. From a time where AHCS and McLean's Drug roughly split the DME market, Home Connections' market entry reduced market concentration; consumers had more choice, not less. Since there is no substantial, credible evidence that prices rose or quality declined, AHCS has not shown harm to the process of competition in the Giles County DME market.

Therefore, since AHCS has not come forward with significantly probative evidence of possession by defendants of monopoly power in the Giles County DME market, willful acquisition or maintenance of that power in an exclusionary or predatory manner, or causal antitrust injury, summary judgment is appropriate for Count 2.

### V. Monopoly Leveraging

■■■■ In Count 3, plaintiff alleges that Giles Memorial leveraged its monopoly power in the acute care services market to gain an unfair competitive advantage for Home Connections in the DME market. Under this theory, plaintiff argues, it need not offer proof that Home Connections possessed monopoly power in the DME market in Giles County to establish a violation of Sherman Act section 2. Rather, plaintiff claims it may show that defendants violated section 2 by using its monopoly power in the acute care services market to gain exclusive access to patients who were in need of DME upon discharge. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).[16] The Sixth Circuit elected to follow *Berkey Photo* in *Kerasotes Michigan Theatres, Inc. v. National Amusements Inc.,* 854 F.2d 135 (6th Cir.1988), *cert. dismissed,* 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989), but the Third and Ninth Circuit Courts of Appeal have emphatically rejected monopoly leveraging as impermissible expansions of the sweep of section 2. *See Fineman,* 980 F.2d at 204–06; *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). The Fourth Circuit has expressly declined in this case to determine whether there exists a claim for "monopoly leveraging" that materially differs from the classic claim for monopolization under Sherman Act section 2. *Radford,* 910 F.2d at 149 n. 17 ("We reserve definitive resolution of that issue for a case in which the issue is squarely presented."); *see also M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 168–69 (4th Cir.1992) (*en banc*) ("There will be time enough to evaluate the validity of this assumption after the parties have developed a factual record."), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993).

The court finds the reasoning in *Fineman* and *Alaska Airlines* more persuasive. *Berkey Photo*'s leveraging theory does not follow from the text of the Sherman Act and destroys the distinction between concerted

---

**16.** In *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570–71 (2d Cir.1990), the Second Circuit cautioned that the *Berkey Photo* discussion of what later became known as "monopoly leveraging" was mere *dictum* and involved a classic tying claim. Therefore, it is unclear if the Second Circuit would recognize monopoly leveraging as distinct from a tying or monopolization claim. *See Sunshine Cellular v. Vanguard Cellular Systems, Inc.,* 810 F.Supp. 486, 495 n. 7 (S.D.N.Y.1992).

conduct that "restrains trade" in section 1 and unilateral conduct that "monopolizes or attempts to monopolize" in section 2. *See Fineman*, 980 F.2d at 205–06. Further, when a monopolist has a lawful monopoly in one market and uses its power to gain a competitive advantage in a second market, the anticompetitive dangers that implicate the Sherman Act are not present. *See Alaska Airlines*, 948 F.2d at 548.

 Even if the court were to accept the monopoly leveraging theory, AHCS has failed to adduce significantly probative evidence that Home Connections gained an unfair competitive advantage in the DME market in Giles County. Without some sort of overt conduct such as steering, Home Connections had no way to "pull the alleged lever." Therefore, summary judgment is appropriate on Count 3.

### · VI. Attempted Monopolization

 Plaintiff alleges that defendants engaged in a series of exclusionary and predatory acts specifically intended to acquire monopoly power in the DME market in violation of Sherman Act section 2. To prove attempted monopolization, the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization. *Radford*, 910 F.2d at 147. Attempted monopolization requires "a specific intent to destroy competition or build monopoly." *Times–Picayune Pub. Co.· v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953). "A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient." *Abcor*, 916 F.2d at 927. The requisite intent to monopolize may be shown through direct evidence or through inference by showing predatory conduct. *Id.* Plaintiff has no direct evidence of specific intent to monopolize; therefore, the first two elements of attempt-

ed monopolization merge into a requisite showing of predatory acts.

 As described in the monopolization section, AHCS can produce no significantly probative evidence of steering of patients by defendants; coercion of doctors or employees by defendants; or uncompetitively high prices or consistently inferior quality of defendants' DME. Therefore, as a matter of law, AHCS cannot satisfy the first two elements of attempted monopolization.

 Where, as in this case, evidence of intent and predatory conduct is weak and entry barriers are low, the plaintiff must show a market share above 50 percent to show a "dangerous probability of success." *See M & M Medical Supplies and Service*, 981 F.2d at 168 attempted monopolization "claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious ..." (citing 3 P. Areeda and D. Turner, *Antitrust Law*, ¶ 835c, at 350 (1978)); *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 112–15 (3d Cir.1992) (holding that defendant's 50 percent market share was insufficient to show dangerous probability of success). As discussed in the monopolization section, Home Connections' market share peaked at 44 percent and averaged 33 percent for the period 1986–1990.[17] Therefore, plaintiff can satisfy none of the elements of attempted monopolization and summary judgment is appropriate on Count 4.

### VII. Conspiracy to Monopolize

 Plaintiff alleges in Count 5 that Giles Memorial and Medserv conspired to participate in exclusionary and predatory acts with the intent to acquire and share the rewards of monopoly power in the DME market in Giles County in violation of Sherman Act section 2. In order to prove a conspiracy to monopolize, "a plaintiff must show concerted action, a specific intent to achieve an unlaw-

---

17. As discussed in the monopolization section, Home Connections' market share fell significantly (from 43 to 34 percent) from 1989 to 1990, which is further evidence that there was no dangerous probability of monopolization of the DME market by defendants. *See Richter Concrete, 691* F.2d at 826. Finally, the fact that Home Connections so swiftly went out of business makes the likelihood of monopolization seem quite remote. *See Lektro–Vend Corp. v. Vendo Co., 660* F.2d 255, 270–71 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

ful monopoly, and commission of an overt act in furtherance of the conspiracy." *Radford,* 910 F.2d at 150. However, "[u]nlike an attempted monopolization claim, it is not necessary that the committed acts, themselves, be predatory." *Id.*

As discussed in the attempted monopolization section, there is no significantly probative evidence that defendants intended to engage in anything other than vigorous competition. *See Abcor Corp.,* 916 F.2d at 927. Therefore, as plaintiff has not shown that defendants intended to monopolize the DME market in Giles County through predatory conduct, summary judgment is appropriate on Count 5.

## VIII. Denial of Access to an Essential Facility

■ In Count 6, AHCS alleges that defendants violated section 2 of the Sherman Act by denying it access to inpatients at Giles Memorial; it claims that access to these patients constitutes a "facility" essential to the ability to compete in the DME market in Giles County. Much like monopoly leveraging, the "essential facilities" approach to monopolization claims examines whether market power in one market (acute care hospital services) is being used to create or further a monopoly in another market (DME). *See Radford,* 910 F.2d at 150.

The four elements of an essential facilities claim are "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility to competitors." *Radford,* 910 F.2d at 150.

■ In order to satisfy the second element, AHCS must show that denial of access to Giles Memorial inpatients in their hospital rooms caused "more than inconvenience, or even some economic loss." *Twin Laboratories,* 900 F.2d at 569–70. Plaintiff must show that this denial inflicted a "severe handicap" that threatened to eliminate competition in the market for DME in Giles County. *See id.; Alaska Airlines,* 948 F.2d at 544–45 ("A facility that is controlled by a single firm will be considered "essential" only

if control of the facility carries with it the power to *eliminate* competition in the downstream market.") (emphasis in original). Market share statistics have shown that access to Giles Memorial patients is *not essential* to doing business in the DME market in Giles County. Throughout Home Connections' existence, rival DME companies continued to do substantial business, and, with the exception of AHCS, were consistently gaining market share. In fact, McLean Drug's share of the total DME market from 1986–1990 exceeds Home Connections' share.

AHCS is also unable to show that defendants denied competitors any access to Giles Memorial inpatients, or that increased access was feasible. As discussed in the monopolization section, patients were presented with a "freedom of choice" form that listed all known options for DME, including AHCS. Discharge personnel were instructed to remain neutral as to a patient's choice. Plaintiff has not come forward with significantly probative evidence of steering or other manipulation; therefore, AHCS did have reasonable access to Giles Memorial patients, and further access would violate Giles Memorial's "non-solicitation" policy. Plaintiff argues that Giles Memorial could have implemented a system whereby qualified DME dealers would rotate initial contacts with Giles Memorial inpatients; however, feasibility must be analyzed not in terms of all the possibilities, but in the context of defendant's normal course of business. *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 545 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 64, 116 L.Ed.2d 39 (1991).

Plaintiff's argument that Giles Memorial's policy of not allowing it face-to-face contact with patients could have been improved to provide more competition does not go far enough to establish a section 2 violation under this framework. Access to patients was not essential to competition in Giles County, nor do Giles Memorial's policies completely deny AHCS patient access, nor is it feasible to permit AHCS to solicit business directly in patient's hospital rooms. Therefore, summary judgment is appropriate on Count 6.

## IX. State Law Claims

█ Plaintiff alleges in Count 7 that defendants have tortiously interfered in AHCS's contracts with former Giles Memorial patients in violation of Virginia common law. Since summary judgment is granted as to all federal antitrust claims, plaintiff's pendent state law claim is dismissed without prejudice. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## X. Conclusion

For the reasons discussed above, defendants' motion for summary judgment is granted. An appropriate order shall issue this day.

### *FINAL ORDER*

In accordance with the written Memorandum Opinion entered this day, it is

### ADJUDGED AND ORDERED

that defendants' joint motion for summary judgment is **GRANTED** as to counts one through six of plaintiff's second amended complaint. The state law claims in count seven of plaintiff's second amended complaint are dismissed without prejudice.

The Clerk of the Court is directed to remove this case from the active docket of the court and to send certified copies of this Order and accompanying Memorandum Opinion to all counsel of record.