**NATSOURCE LLC, Plaintiff,**

v.

**GFI GROUP, INC., Patrick Curley, Christopher M. D'Ambrosi, Richard G. Heffernan, John Prendergast, Angelo Primavera, Jr., Joshua D. Slansky and Gregory Woyshner, Defendants.**

No. 03 Civ. 10071(RWS).

United States District Court, S.D. New York.

Aug. 20, 2004.

Kasowitz, Benson, Torres & Friedman, By: Daniel B. Goldman, Gary W. Dunn, of counsel, New York, NY, for Plaintiff.

Epstein, Becker & Green, By: Peter L. Altieri, Lauri F. Rasnick, of counsel, New York, NY, for Defendants.

## OPINION

SWEET, District Judge.

The defendants have moved under Fed. R.Civ.P. 12(b)(6) to dismiss the complaint of Natsource LLC ("Natsource") and under Fed.R.Civ.P. 56 for summary judgment. For the reasons set forth below, the motion to dismiss the complaint is denied, and the motion for summary judgment is granted.

### The Parties

Natsource is an inter-dealer broker of electrical power.

GFI Group, Inc. ("GFI") is the parent of non-party GFI Brokers LLC, and is also an inter-dealer of electrical power. GFI Brokers LLC is the employer of Patrick Curley ("Curley"), Christopher D'Ambrosi ("D'Ambrosi"), Richard Heffernan ("Heffernan"), John Prendergast ("Prendergast"), Angelo Primavera ("Primavera"), Joshua Slansky ("Slansky"), and Gregory Woyshner ("Woyshner") (collectively the "Individual Defendants"). The Individual Defendants are brokers of electrical power formerly employed by Natsource who have been hired by GFI.

### Prior Proceedings

Natsource filed its complaint in this action on December 18, 2003, seeking redress for damages that it suffered as the result of, *inter alia*, GFI's unlawful attempt to monopolize the voice brokerage of electric power in the "Eastern Market," which includes the New England states, New York, Pennsylvania, New Jersey, Maryland and the "ANC business," which "involves the buying and selling of electrical line capacity, as it is conducted in the Eastern market and other markets." Complaint. ¶ 19. Natsource alleged that in an attempt to obtain monopoly power, GFI, through wrongful means, induced a large group of Natsource's brokers to leave the employ of Natsource and to join GFI, effectuating the transfer of the vast majority of Natsource's customers in the Eastern Market to GFI. Complaint ¶ 28–52.

To achieve its goal of attaining monopoly power, Natsource has alleged that GFI misappropriated confidential information from Natsource, (*see id.* at ¶¶ 28–32), breached a confidentiality agreement with Natsource and used confidential information protected by that agreement in furtherance of its plan to co-opt Natsource's customers, *see id.*, aided and abetted breaches of the fiduciary duties of Natsource's former brokers, *see id.* at ¶¶ 33–38, and tortuously interfered with the employment contracts between Natsource and such brokers, *see id.* at ¶¶ 33–38, 44–45.

As the result of this wrongdoing, GFI achieved a market share in excess of 60% of the Eastern Market, and Natsource, suffering millions of dollars in damages, can no longer effectively compete in that market. *See id.* at ¶¶ 39–43, 47–48.

No discovery has been conducted. The instant motion was heard and marked fully submitted on April 28, 2004.

### The Facts

The facts are set forth in the Rule 56.1 Statement of GFI and have not been challenged by Natsource and consequently are not contested except as noted.

GFI and Natsource are both inter-dealer brokerage firms which engage in voice-

based brokerage, *id.* at ¶ 18, and function as intermediaries, matching the bids and offers for various products, including financial products and energy-related products. These bids and offers are made by institutions, primarily large banks and utility companies (the "dealers" or "customers"). *Id.* at ¶ 21.

Electric power, which is one of the products brokered by the Individual Defendants, is a highly homogeneous product, differentiated primarily by the region in which it is traded. *Id.* at ¶ 20. Customers of electric power do not necessarily use the power that is bought and sold. *Id.* at ¶ 21. Some customers, such as financial institutions, merely engage in speculative trading of the product. Other customers, such as utilities, may buy or sell electric power depending upon the needs of their respective companies. *Id.* at ¶ 20. Regardless of the purpose behind the purchase, customers of inter-dealer brokerage firms want one thing—to efficiently get the best price for the purchase or sale of electric power. *Id.* at ¶ 18.

As the customers of inter-dealer brokerage firms which broker electric power are large financial institutions and utility companies, they are readily identifiable by all brokers of electric power and can be easily located in public sources such as *OPIS/-Stalsby's Who's Who in Natural Gas & Power.* Neither trade secrets nor proprietary information are involved in the identification of possible customers. The relationships between brokers and traders, by necessity, are personal, and they can only be developed over many years in both a business and, often, a non-business context. *Id.* at ¶ 4. Traders in the Eastern Market allow a select few brokers with whom they regularly do business to establish a direct phone line to traders, which operate like an intercom in which traders and brokers can instantly communicate with each other by simply touching a button and talking into a speaker. *Id.* at ¶ 25. The traders allow only a few of these lines to be installed at their desks. Only the brokers who have the closest relationship with them secure this privilege.

Each institutional customer routinely utilizes the services of competing inter-dealer brokerage firms simultaneously. No inter-dealer brokerage firm possesses a proprietary interest in any of these customers concerning the buying and/or selling of electric power. While an inter-dealer broker can act as an intermediary between or among customers regarding the negotiation of a price, the broker does not take a proprietary position during the transactional process, nor does (or can) he or she set the price or have any particular interest in whether prices of the electricity are higher or lower. In exchange for successfully completing transactions, inter-dealer brokerages earn commissions from both counter-parties to the trade.

### The Motion To Dismiss The Complaint Is Denied

The complaint has stated a claim for attempted monopolization. In reviewing a 12(b)(6) motion, courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (citing *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993)). However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 122 (S.D.N.Y.1988). The complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957); *see also Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). "This rule applies with no less force to a Sherman Act claim...." *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

In determining a motion to dismiss, "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken are considered." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993). "A court's task in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence to which might be offered in support thereof.'" *Levitt v. Bear Stearns & Co., Inc.,* 340 F.3d 94, 101 (2d Cir.2003) (quoting *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)).

■ "No heightened pleading requirements apply in antitrust cases. '[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules.'" *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001) (quoting *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir. 1977)). "The discovery process is designed to provide whatever additional sharpening of the issues is necessary." *George C. Frey,* 554 F.2d at 554. "[I]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Todd,* 275 F.3d at 198 (quoting *George Haug Co. v. Rolls Royce Motor Cars Inc.* 148 F.3d 136, 139 (2d Cir.1998)).

■ Natsource has pleaded a claim for attempted monopolization. Section 2 of the Sherman Act makes it unlawful to "attempt to monopolize ... any part of the trade or commerce among the several States ..." 15 U.S.C. § 2 (1997). "To establish a claim for attempted monopolization, a plaintiff must prove: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize [1] and (3) a dangerous probability of achieving monopoly power." *Tops Markets, Inc. v. Quality Markets, Inc.* 142 F.3d 90, 99–100 (2d Cir.1998).

Natsource has alleged, *inter alia,* that GFI tortiously interfered with its contracts and business relationships, that it aided and abetted certain Natsource employees in breaching their fiduciary duties, that it intentionally breached a confidentiality agreement for the purposes of co-opting Natsource's business, and that it misappropriated Natsource's trade secrets. (*Id.* at ¶¶ 28–65, 75–83).

■ While the hiring of employees alone generally cannot give rise to antitrust liability, the hiring of a competitor's employees in conjunction with other wrongful acts, such as those alleged in the complaint, can constitute anticompetitive conduct in violation of the Sherman Act.

In *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.,* 812 F.2d 786 (2d Cir.1987), the Second Circuit reversed the denial of a motion for a judgment as a matter of law following a jury verdict in favor of plaintiff. The jury had found that plaintiff's competitor, Walsh, and certain of plaintiff's former employees conspired in restraint of trade when the former employees, prior to leaving plaintiff's employ for jobs with Walsh, met with Walsh and purportedly agreed to assist in Walsh's plan to wage a predatory

---

**1.** GFI has not challenged Natsource's complaint on the grounds that Natsource has not sufficiently pleaded that GFI had a specific intent to monopolize.

price war. *Id.* at 794. Finding the jury's verdict with respect to this claim to have been improperly based on speculation, the court emphasized "that the evidence must be evaluated in the context of the pending employer/employee relationships between the competitor and plaintiff's former employees." *Id.* at 795. The court noted that "[a]s a general policy matter, one firm's hiring of its competitor's employees does not present a 'compelling case for antitrust intervention.'" *Id.* at 795 n. 7 (citing 3 P. Areeda & D. Turner, *Antitrust Law,* § 702b at 109 (1978)). Finding the plaintiff had not met its burden of proof, the court held that "[t]he pre-employment meetings between [Walsh] and [plaintiff's employees] were just as likely held to discuss their future employment relationship as to hatch a predatory pricing scheme." *Id.* at 795. The court stated that:

> [o]ur conclusion might be altered had the [former employees] misappropriated trade secrets from [plaintiff] in the course of working for [the competitor]. The jury, however, found that [plaintiff] possessed no such trade secrets.

*Id.* at 795 n. 7.

While *Walsh Trucking* states that the hiring of a competitor's employees alone generally cannot result in an antitrust violation, it supports the proposition that the hiring of a competitor's employees in conjunction with other wrongful acts—such as misappropriation of trade secrets or aiding or abetting breaches of loyalty—can result in such violations. 813 F.2d at 795 n. 6 & 7;[2] *see also* 1 Callmann on Unfair Competition, Trademarks and Monopolies § 421 (4th Ed. West 2003) (Under § 2 of the Sherman Act, "[p]rocuring a breach of the fiduciary duty owed to a competitor by its employees can be a predatory tactic. So can conspiring with a competitor's employees to obtain the competitor's trade secrets.") (footnotes omitted). Since Natsource alleges, *inter alia,* that GFI aided and abetted breaches of fiduciary duty and that it misappropriated trade secrets, Natsource clearly has alleged the additional wrongdoing necessary to state a valid antitrust claim.

### Summary Judgment Is Granted

"When a motion for summary judgment is made ... an adverse party may not rest upon the mere allegations ... of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Here, Natsource has relied solely on the allegations of the complaint and did not oppose GFI's motion for summary judgment, either by raising issues of fact or

---

**2.** Other cases cited by GFI are similarly unavailing. In *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884 (5th Cir.1984), a case in which the court affirmed judgment as a matter of law, the court stated that a valid antitrust claim can be predicated "on the basis of evidence that the defendant had induced the plaintiff's employee to act disloyally ..." *Id.* at 894 (emphasis added). However, the court found that plaintiff's former employee did not act disloyally under the specific facts of this case. *Id.*

In *Abcor Corp. v. AM Int'l, Inc.,* 916 F.2d 924 (4th Cir.1990), the court considered the appeal of a grant of summary judgment dismissing an antitrust case predicated in part on the defendant's hiring of two of plaintiff's employees. *Id.* at 930. The court affirmed, finding, based on the unique facts of that case, that "nothing suspicious taint[ed] the hiring of the two employees." *Id.* Thus in *Abcor,* after being allowed to conduct discovery, plaintiff failed to marshal evidence in support of its claim. Nothing in this case supports the proposition that Natsource's claims now should be dismissed as a matter of law.

controverting the Rule 56.1 Statement in any way.

Rule 56.1 provides that "papers opposing [summary judgment] shall include a separate, short and concise statement of the material facts as to which it is contended there exists a genuine issue to be tried." Local Civil Rule 56.1(b). Accordingly, summary judgment is appropriate because the facts contained in defendant's statement of facts must be "deemed to be admitted." Local Civil Rule 56.1(c). *See Dusanenko v. Maloney,* 726 F.2d 82 (2d Cir.1984) (finding that facts set forth in movant's statement of undisputed facts were properly deemed admitted where the nonmovant failed to serve any opposing statement); *Naantaanbuu v. Abernathy,* 816 F.Supp. 218, 222 (S.D.N.Y.1993) (where the party failed to submit an opposing statement of material facts, "all facts in the defendants' [Rule 56.1 Statement] [were] deemed admitted").

■ To withstand a motion for summary judgment, on an attempted monopolization claim, a plaintiff must identify a plausible antitrust market and establish that defendant has sufficient market power in that market to create a dangerous probability of obtaining monopoly power. *PepsiCo., Inc. v. Coca-Cola Co.,* 315 F.3d 101, 106 (2d Cir.2002); *Tops Mkts., Inc.* 142 F.3d at 100. The Second Circuit has "consistently interpreted both monopoly and the attempt to monopolize as requiring some measure of market power." *Walsh Trucking,* 812 F.2d at 791.

Monopoly power has been defined by the Supreme Court as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Thus, to succeed on its "Attempted Monopolization" claim, Natsource must be able to demonstrate that GFI's hiring of former Natsource brokers

has created a dangerous probability that GFI will be able to raise prices above competitive levels, or to exclude competition in the relevant market defined in the complaint.

Natsource has failed to establish that the hiring of seven employees gives GFI the ability to raise its commissions. Commission rates are established through negotiations with customers who use multiple brokers and who have other avenues for trading electric power. Natsource has not advanced any plausible antitrust theory to explain how GFI possibly could exclude competition as a result of the hires at issue, especially since Natsource, along with at least ten other entities, now compete with GFI in voice-brokering.

■ In assessing whether GFI has a dangerous probability of achieving monopoly power, four elements must be considered: (1) whether Natsource has adequately alleged the relevant market; (2) market shares within the market; (3) barriers to entry in the relevant market; and (4) whether market power has or can be obtained.

### The Relevant Market

■ Natsource has defined the relevant market in relying on the "Eastern Market" as the applicable one. "Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices." *Re-Alco Indus., Inc. v. National Ctr. for Health Educ.,* 812 F.Supp. 387, 392 (S.D.N.Y.1993) (citation omitted).

In *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, (2d Cir. 1999), the Second Circuit laid out the standards for determining whether the relevant market has been adequately defined:

The relevant market for purposes of antitrust litigation is the "area of effective

competition" within which the defendant operates. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). As the Court explained in *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956): "The . . . [relevant] market is composed of products that have reasonable interchange-ability for the purposes for which they are produced-price, use and qualities considered." *Id.* at 404, 76 S.Ct. 994. Thus, products or services need not be identical to be part of the same market. *See id.* at 394, 76 S.Ct. 994 ("[W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others."). In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.

*Id.* at 227. Further, "[t]he relevant market product must be identified, and the plaintiff must 'allege how the net economic effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternate source is available' to consumers in that market." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 58 F.Supp.2d 228, 238 (S.D.N.Y.1999) (internal quotations and citations omitted).

 Here, Natsource has alleged that the relevant market is limited to voice brokerage in a geographic area described as the "Eastern Market," which Natsource defines as including "the geographic regions known as NEPOOL (New England), New York, PJM (Pennsylvania, New Jersey and Maryland) and ANC." Complaint ¶ 16. Natsource does not explain what

ANC is beyond stating that it "involves the buying and selling of electrical line capacity, as it is conducted in the Eastern market and other markets." Complaint. ¶ 19. Natsource further asserts in a conclusory fashion "[t]here is little or no cross elasticity of demand . . . between the Eastern Market and other voice brokerage markets." *Id.* at ¶ 23. Natsource has asserted that the power grids are physically distinct, and the individual brokers only have relationships with individuals who trade within their limited areas.

Notwithstanding Natsource's demarcation of the Eastern Market, many transactions are undertaken by national customers that do not trade electric power for their own use, *see id.* at ¶ 21, and accordingly are not bound by any grid system or otherwise limited geographically to when they can buy or sell electric power.

Although Natsource has alleged that there is no cross-elasticity of demand between voice brokerage and electronic brokerage because electronic brokerage is appropriate only for less complex deals, GFI has established by factual assertion that the majority of the deals completed through voice brokers are considered to be less complex deals.

Although Natsource claims that direct deals between customers are rare and confined to short term trades, *see id.* at ¶ 27, inter-dealer brokers are not privy to the internal deals conducted by and among the customers. Peter Wise ("Wise"), the head of the Energy Division at GFI, stated in a sworn affidavit that, based on his experience in the energy brokerage business, "some very complex deals are negotiated directly between customers." Wise Affidavit, ¶ 17. GFI has established as a factual matter that voice brokerage is used by customers of electric power when they believe it offers the best prices as a result of the efficiencies involved.

 Even if it is assumed that Natsource had correctly defined the relevant market, it cannot demonstrate that GFI has or could obtain the necessary market share from which a finding of market power can be inferred. "The law in the Second Circuit is clear that a 19% market share cannot sustain a monopolization or attempt to monopolize claim." *Cohen v. Primerica Corp.*, 709 F.Supp. 63, 66 (E.D.N.Y.1989) (citing *Nifty Foods Corp. v. Great Atlantic and Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980)). Even market shares of approximately 50% are insufficient to demonstrate market power where other factors such as low barriers to entry and strong competition, both of which are present here, exist. *U.S. v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir.1984); *see also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir.1984).

Natsource has alleged that GFI has obtained a 60% market share as a result of the employment of the Individual Defendants, but there are no publicly available figures to indicate the market shares of voice brokerage firms in any geographic area, calculated either by gross or net revenues, or even numbers of transactions.

In addition to GFI and Natsource, there are at least ten other competitors engaged in the voice brokerage of electric power and capacity within the area described by Natsource as the Eastern Market. In the aggregate, GFI's competitors collectively employ approximately sixty-five to seventy-five brokers in the so-called "Eastern Market." According to the evidence on the record, GFI's market share has not been established by the undisputed facts presented in this record. The rough measure of market share proposed by GFI is to determine the proportion of GFI's brokers in relations to the total number of brokers in the Eastern Market alleged by Natsource, which yields a figure of approximately 20%. As Natsource points out, this method is likely to be inaccurate because an accurate "calculation will include the volume of revenues or commissions generated by GFI and by its brokers." Natsource Opp. Brief at 21 n. 10. However, Natsource has provided no evidence to show that the 60% figure could be established, and has only made the conclusory assertion that "GFI's brokers generate the vast majority of the revenues and commissions in the Eastern Market." *Id.* On a motion for summary judgment, this failure to present any evidence is dispositive.

 In any event, "[m]arket share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir.1986) (citing *Waste Mgmt., Inc.*). These ways include a contemporaneous rise in price with increased market share. *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 666 (7th Cir. 2004). Natsource has not established showing market share sufficient to wield the market power required to raise prices to exclude competition.

In addition, barriers to entry in the voice brokerage market are low, and as such, there can be no dangerous probability of monopolization. *Tops Mkts., Inc.*, 142 F.3d at 99. It is well settled that "market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power ... [and][o]ther market characteristics must also be considered ... [including] the barriers to entry ..." *Walsh Trucking*, 812 F.2d at 791–92 (citations omitted). *See American Prof'l Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publications, Inc.*, 108 F.3d 1147, 1154 (9th Cir.1997)

(citing *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir.1995)) (stating "[e]ven if [defendant] has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power, can exist absent evidence of barriers to new entry or expansion."); III P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 807g (2d ed.2002).

To enter the voice brokerage market, there is little impediment, if any. There are no regulatory requirements, and very little capital is needed to engage in the voice brokerage of electric power, or other commodities. Nothing more is required than office space, telephone lines, and the brokers themselves, who can be employed at relatively low base salaries, as Natsource's contracts with the Individual Defendants amply demonstrate.

In contrast to Natsource's allegations, the undisputed facts establish that individual brokers are far from unique. Significantly, six of the seven Individual Defendants were employed at-will and could have left at any time, the majority with only a months' notice. Also, Natsource's employment agreements with six of the seven Individual Defendants did not specify that the brokers' responsibilities were limited to the brokerage of electric power in the so-called "Eastern Market," nor did they limit their employment responsibilities to the brokerage of electric power.

New brokers are hired, trained and are conducting business in a matter of months and experienced brokers have the ability to change product areas and can handle different trading responsibilities as the market dictates. Also, experienced bro-

kers frequently are hired from one market competitor to another.

■ The Department of Justice Antitrust Division's Merger Guidelines adopt a two-year test for determining whether there are barriers to entry in a market: if successful entry is likely within two years, there are no significant entry barriers and the government will not challenge mergers in that market. *See generally*, U.S. Dep't of Justice and FTC, 1997 Horizontal Merger Guidelines § 3.2; *see also F.T.C. v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 55–58 (D.D.C.1998) (recognizing the Merger Guideline's two year test); *U.S. v. Syufy Enters.*, 903 F.2d 659, 666 (9th Cir.1990) (recognizing that there were no barriers to entry where competitors entered market within two years).[3] Thus, to establish sufficiently high entry barriers, Natsource would have to show that it would take at least two years for a competitor to enter the market and compete with GFI once it had obtained monopoly power. Here, however, finding brokers to service this market, whether by training, switching product areas or hiring brokers, and establishing phone lines and customer relationships, can be done in a matter of months.

Natsource does not allege that it would take years to enter the market, and Natsource's own employment agreements make clear, "timing" is not a serious concern in this market. Specifically, Natsource's non-compete clauses in the employment agreements at issue are for far less than two years—indicating that it takes less than two years to use experienced brokers hired from competitors or

---

**3.** Although the Merger Guidelines do not carry the force of law, the courts note that they are helpful in providing an analytical framework for evaluating antitrust cases. *See New York v. Kraft General Foods, Inc.* 926 F.Supp. 321, 359 (S.D.N.Y.1995) (relying on the Merg-

er Guidelines to determine the relevant product market); *see also Waste Mgmt., Inc.* 743 F.2d at 982 (using Merger Guidelines to evaluate ease of market entry); *Ball Mem'l Hosp., Inc.*, 784 F.2d at 1336 (utilizing Merger Guidelines to calculate market share).

to train new brokers in order to enter or expand in the market.

■ There can be no violation of the antitrust laws unless the challenged conduct has harmed consumers, or at least has the potential to harm consumers, by increasing price and/or decreasing output. [E]ven assuming that [plaintiff's] market share evidence were sufficient to create a triable issue as to market power, [plaintiff's] claim could not withstand summary judgment. "[A] showing of market power, while necessary to show adverse effect indirectly, is not sufficient. There must be other grounds to believe that the defendant's behavior will harm competition market-wide...." *CDC Technologies, Inc. v. IDEXX Laboratories, Inc.*, 186 F.3d 74, 81 (2d Cir.1999) (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995)). As explained by Judge Easterbrook, "[m]arket power means the ability to injure consumers by curtailing output and raising price; no possible injury, no market power, no market power, no violation; injury to the consumers is therefore an essential ingredient of liability." *Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024, 1032 (7th Cir.1988) (citations omitted). *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (stating that " 'proof of actual detrimental effects, such as reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' ") (quoting 7 P. Areeda, *Antitrust Law* ¶ 1511, p. 429 (1986)).

Here, there has been no reduction in output or change in price. There are multiple inter-dealer brokers currently doing business in the geographic market defined by Natsource, including Natsource. That has not changed by the movement of some brokers from one company to another.

GFI has not increased prices, nor could it and still remain competitive. "[W]hen customers are not tied to particular sellers each seller may perceive the demand as highly elastic (meaning the customers will quickly switch if any one supplier raises price, which makes the increase unprofitable)." *Ball Mem'l Hosp. Inc.*, 784 F.2d at 1332. The existence of price sensitive consumers prohibits any competitor from obtaining the power to control prices. *Id.* In fact, in the complaint, Natsource concedes that the customers of "power brokers expect that brokers will attempt to match offers and bids as closely as possible to obtain what is known as the 'best price.' " (*Id.* at ¶ 18). If customers purchasing electric power desire the best prices, their multiple relationships with a variety of inter-dealer brokers permits them to shop for the best prices for the underlying commodities and the commissions both before or after the employment of the Individual Defendants by GFI.

Significantly, Natsource does not allege that prices have increased, or that they will increase, as a result of the employment changes. Paragraph 46 of the Complaint alleges, upon information and belief, that GFI has hired the Individual Defendants "in expectation that it will be able to raise, directly or indirectly, the prices that it charges its customers in the Eastern Market," without conclusory and self-serving allegations are insufficient to withstand the instant motion. *See e.g., Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F.Supp. 876, 887–88 (S.D.N.Y.1995).

■ Natsource has sought to resist summary judgment because there has been no discovery. However, the absence of discovery alone does not necessarily bar summary judgment. *Connecticut Nat'l Bank v. Trans World Airlines, Inc.*, 762 F.Supp. 76, 79 (S.D.N.Y.1991) (holding that the court was not precluded from

entering summary judgment due to the fact that no discovery had been conducted). Where a non-movant simply relies on bare allegations, dismissal is appropriate prior to discovery. *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 251 (2d Cir.1985). For example, the *Eastway* court dismissed an antitrust claim, stating that "[a] bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment." 762 F.2d at 251 (citations omitted). An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." 6 J. Moore, *Federal Practice* ¶ 56.15(3) at 56–486 to 65–487 (2d ed.1976) (cited by *Contemporary Mission Inc. v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

"[I]f the nonmoving party does not [set forth specific facts showing there is a genuine issue of material fact] summary judgment will be entered against him." *Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Here, Natsource not only admitted the facts contained in Defendants' Rule 56.1 Statement, but failed to set forth any disputed substantial facts whatsoever, relying solely on allegations in an unverified complaint. Summary judgment may properly be granted in antitrust cases and regularly is, where, as here, there is no viable claim based on the undisputed facts. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 229–30 (2d Cir.1999); *CDC Techs.,* 186 F.3d at 81.

■ In any event, Natsource failed to submit a Rule 56(f) affidavit which is required where discovery is allegedly needed to oppose a summary judgment motion. *See* Fed.R.Civ.P. 56(f). Pursuant to well-settled law, even "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit, and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (citations omitted); *Gurary v. Winehouse,* 190 F.3d 37 (2d Cir.1999) (affirming Judge Stanton's grant of summary judgment and denying opportunity for discovery in securities case where plaintiff failed to satisfy Rule 56(f) test). This is clearly insufficient under the law:

> If facts essential to support opposition to the summary judgment motion are not available, the nonmoving party may seek a continuance under Rule 56(f) to permit affidavits to be obtained or discovery to be had, but may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the moving party's pleading.

*Gan,* 996 F.2d at 532 (citations and quotations omitted).

■ To be a sufficient affidavit, it "must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant had made to obtain those facts; and why those efforts were unsuccessful." *Paddington,* 34 F.3d at 1138. Nor does Natsource, even in its legal memorandum, explain how discovery would lead to evidence to create material issue of fact. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 422 (2d Cir.1989) (denying request for discovery to oppose summary judgment because "even if plaintiffs had obtained what they

stated would be uncovered, the information would have been insufficient to defeat summary judgment"). Accordingly, Natsource's request for discovery to avoid summary judgment must be denied.

Because Natsource has failed to allege a relevant market, has not shown that GFI has a sufficient market share to demonstrate market power, has not shown that there are significant barriers to entry, and has not shown that the challenged conduct would harm consumers, it has not demonstrated that GFI's actions create a dangerous probability of obtaining monopoly power. Accordingly, Natsource's claim for attempted monopolization under Section 2 of the Sherman Act is dismissed.

### Natsource's Remaining New York Law Claims Will Be Dismissed For Lack Of Subject Matter Jurisdiction

According to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims if the court dismisses all claims over which it has original jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding "[c]ertainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); *Jordan Inv. Co. v. Hunter Green Inv., Ltd.*, 154 F.Supp.2d 682, 695 (S.D.N.Y.2001) (after dismissing RICO claim, dismissing state law claims without prejudice); *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages*, No. 00 Civ. 5663, 2001 WL 1468168, at *15 (S.D.N.Y. Nov.19, 2001) (after dismissing antitrust claim, dismissing state law claims without prejudice); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994).

The Court declines to exercise supplemental jurisdiction over its New York law based claims, dismissing the complaint against all defendants in its entirety.

### Conclusion

For the reasons stated above, GFI's Rule 12(b)(6) motion to dismiss Natsource's complaint is denied. The motion for summary judgment dismissing Natsource's claims for attempted monopolization under Section 2 of the Sherman Act is granted, and the remaining New York State law claims are dismissed without prejudice for lack of subject matter jurisdiction.

It is so ordered.